## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## MIDLAND/ODESSA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| **v.** | § | **MO:24-CR-60-DC** |
| **SAN YNES PATINO** | § | |

### ORDER DENYING MOTION FOR RECONSIDERATION

BEFORE THE COURT is Defendant San Ynes Patino's Motion for Reconsideration of Motion to Dismiss Indictment.[1] Patino was convicted under § 922(g)(1) of unlawfully possessing a firearm with a felony conviction. The sole conviction on which his § 922(g)(1) conviction is predicated is possession of marijuana. He has no prior "violent" convictions.

The Motion asks this Court to reconsider whether Patino's Second Amendment rights were improperly infringed when he was indicted under § 922(g)(1) in connection with his possession conviction. To answer this, the Court must determine whether the Government has identified a historical analogue consistent with our nation's history and tradition that warrants disarming Patino. Because this Court finds that the Government has met its burden, the Motion is **DENIED,** and the indictment stands.

### I.     BACKGROUND/PROCEDURAL HISTORY

In March 2024, detectives with the Odessa Police Department received information that an individual, later identified as Brittany Patino, was distributing large quantities of methamphetamine. Officers arranged for a confidential source (CS) to make a controlled buy

---

[1] Doc. 39.

of methamphetamine from Brittany. During the purchase, the CS heard Brittany making several calls to an individual named "Sonny," later identified as Defendant San Ynes Patino. During the call, Defendant Patino was heard telling Brittany that he had only a half ounce of methamphetamine on his person but that he would come deliver what he had.

Detectives observed Patino drive a 2005 Chevrolet Equinox to Brittany's home. A female exited the Equinox and delivered 14 grams of methamphetamine to the CS. After the delivery, uniformed officers with the University of Texas Permian Basin ("UTPB") attempted to perform a traffic stop on Patino and the female. Patino refused to pull over and led officers on a vehicle pursuit into a residential area before Patino eventually bailed from the Equinox and evaded on foot. The female was detained at the Equinox. After a brief foot pursuit, Patino was captured and brought back to the Equinox. Officers smelled marijuana coming from the vehicle and performed a search. Inside, on the front passenger floorboard, officers located a Walther model P-22 semiautomatic handgun loaded with eight rounds. The Walther P-22's serial number had been obliterated as had the weapon's country or state of origin. Patino was read his Miranda warnings, which he knowingly waived. Following the interview, Patino was indicted for possession of a firearm following a felony conviction in violation of § 922(g)(1).

This was not Patino's first brush with the law. Patino's criminal history boasts multiple misdemeanor and felony convictions. But for purposes of his conviction under § 922(g)(1), only his felony conviction for possession of marijuana, for which he was sentenced to 21 months confinement, probated for four years, is at issue.

Patino argues in the instant Motion that the Court erred when it denied his original Motion to Dismiss Indictment[2] and that his predicate felony of marijuana possession is insufficient to sustain a conviction under § 922(g)(1). In the Motion, Patino argues that § 922(g)(1) is unconstitutional, both facially and as applied to him, in the wake of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*.[3]

Seeking additional case law on the matter, the Court ordered the parties to produce supplemental briefing on whether Patino's drug conviction had historical analogues that warranted upholding his § 922(g)(1) conviction. Having considered those briefings, the Court finds that sufficient analogues exist and **DENIES** the Motion.

## II.    STANDARD

Federal Rule of Criminal Procedure 12 allows a party to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."[4] The rule allows a defendant to file a pretrial motion to dismiss an indictment on the ground that there is "a defect in the indictment," such as the "failure to state an offense."[5] A court may rule on a pretrial motion to dismiss an indictment where, as here, the motion presents a question of law involving undisputed facts.[6]

---

[2] Doc. 18.
[3] 597 U.S. 1 (2022).
[4] Fed. R. Crim. P. 12(b)(1).
[5] *Id.* 12(b)(3)(B)(v); *United States v. Vasquez*, 899 F.3d 363, 371 (5th Cir. 2018).
[6] *United States v. Flores*, 404 F.3d 320, 325 (5th Cir. 2005).

### III.    SECOND AMENDMENT JURISPRUDENCE

Before considering the arguments, it is necessary to understand the "still-developing area" of Second Amendment jurisprudence, a field "still in the relatively early innings."[7]

The Second Amendment mandates that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[8] Interpreting this language in the landmark case, *District of Columbia v. Heller*, the Supreme Court recognized that the Second Amendment "protect[s] an individual right to keep and bear arms for self-defense."[9] But "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and "nothing . . . should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," which are "presumptively lawful."[10]

Following *Heller*, courts across the country, including the Fifth Circuit, adopted a two-part test for analyzing laws that impact the Second Amendment.[11] Under this inquiry, courts first asked whether the challenged law impinged upon a right protected by the Second Amendment.[12] If it did, courts proceeded to the second step, at which point they determined whether to apply intermediate or strict scrutiny and then applied that requisite level of

---

[7] *United States v. Rahimi*, 144 S. Ct. 1889, 1923 (2024) (Kavanaugh, J., concurring).
[8] U.S. CONST. amend. II.
[9] *Bruen*, 597 U.S. at 17 (citing *Heller*, 554 U.S. at 595 (internal quotation omitted)).
[10] *Heller*, 554 U.S. at 626-27 n.26.
[11] *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016), *abrogated by Diaz,* 116 F.4th at 458.
[12] *Id.* (citing *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012)).

scrutiny to the challenged law.[13] Under this two-part test, the Fifth Circuit (and others) repeatedly upheld the constitutionality of § 922(g)(1).[14]

This all changed with *Bruen* when the Supreme Court refined the *Heller* test and "extended *Heller*'s protection for carrying handguns in the home to carrying them publicly."[15] In so doing, "the Court rejected the second step of the two-step framework that had developed after *Heller*."[16] What remained is the first step—considering whether the challenged law infringes on Second Amendment rights.

This new inquiry dictates that once step one is established, the burden shifts to the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."[17] The government must detail "*how and why* the regulations burden a law-abiding citizen's right to self-defense."[18] Because the question of whether a law infringes on one's Second Amendment rights is rarely at issue, "the 'two-step' view of *Bruen* is effectively collapsed into one question: whether the law is consistent with our Nation's history of firearm regulation."[19]

Applying the new *Bruen* framework in *Rahimi*, the Fifth Circuit found § 922(g)(8)—a statutory provision restricting firearm possession by individuals convicted of misdemeanor

---

[13] *Id.*

[14] *See, e.g., Hollis*, 829 F.3d at 446 (upholding § 922(g)(1) under two-part inquiry); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) (same); *United States v. Staten*, 666 F.3d 154, 158 (4th Cir. 2011) (same).

[15] *United States v. Diaz*, 116 F.4th 458, 463 (5th Cir. 2024) (citing *Heller*, 597 U.S. at 8-9).

[16] *Id.* (citing *Heller*, 597 U.S. at 19) ("Despite the popularity of this two-step approach, it is one step too many.").

[17] *Id.* at 465 (citing *Heller*, 597 U.S. at 17).

[18] *Bruen*, 597 U.S. at 29.

[19] *Id.* (citing *Rahimi*, 144 S. Ct. at 1898).

domestic violence—facially unconstitutional.[20] In evaluating the statute, the Fifth Circuit found no sufficiently similar historical analogues to the civil restraining order that allowed Rahimi to be disarmed, *i.e.*, that the disarmament was inconsistent with American history and tradition.[21]

On review at the Supreme Court, an eight-Justice majority reversed, holding that § 922(g)(8) and its application to Rahimi " 'fits comfortably' in this Nation's tradition of 'preventing individuals who threaten physical harm to others from misusing firearms.' "[22] A major theme of the opinion was that lower courts had improperly read *Bruen* to require a "historical twin."[23] The Court reminded that even when a challenged regulation does not precisely mirror its historical precursors, "it still may be analogous enough to pass constitutional muster."[24]

The *Rahimi* Court located its first analogue in surety laws—laws used to " 'prevent all forms of violence, including spousal abuse' and the misuse of firearms."[25] Additional support existed in "going armed" laws, which prohibited "riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land."[26] Because such conduct "disrupted the public order and led almost necessarily to actual violence . . . the law punished these acts with forfeiture of the arms and imprisonment."[27]

---

[20] 61 F.4th 443, 450–51 (5th Cir. 2023), *rev'd*, 144 S. Ct. 1889 (2024).
[21] *Id.* at 456.
[22] *Id.* at 464 (citing *Rahimi*, 144 S. Ct. at 1897).
[23] *Rahimi*, 144 S. Ct. at 1903 (quoting *Bruen*, 597 U.S. at 30).
[24] *Id.* (quoting *Bruen*, 597 U.S. at 30).
[25] *Diaz*, 116 F.4th at 464 (citing *Rahimi*, 144 S. Ct. at 1900).
[26] *Id.* (citing *Rahimi*, 144 S. Ct. at 1901(internal citation omitted)).
[27] *Rahimi*, 144 S. Ct. at 1901 (internal citation omitted) (cleaned up).

Examining the "why and how," the *Rahimi* Court clarified that both surety and going armed laws burdened the Second Amendment and that "just like § 922(g)(8), both surety and going armed laws were used 'to mitigate demonstrated threats of physical violence.' "[28] In other words, § 922(g)(8)'s burden was "comparable to the burdens imposed by surety and going armed laws."[29] Additionally, violations of surety and going armed laws often led to imprisonment.[30] If imprisonment was permissible in response to the use of guns to threaten others' physical safety, reasoned the Court, then the lesser restriction of temporary disarmament imposed by § 922(g)(8) is also permissible.[31]

The *Rahimi* Court concluded by clarifying that it held "only this": "An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment."[32] However, while the Court so narrowly limited its holding, a key takeaway was that, in applying the history and tradition test, courts should apply a more conceptual analysis.[33] Requiring exact historical twins would "be as mistaken as applying the protections of the [Second Amendment] right only to muskets and sabers."[34] The Court, therefore, conducted a highly generalized form of analogical reasoning that likened surety and going armed laws to the civil restraining order imposed on *Rahimi* and reasoned that the Fifth Circuit erred in demanding some stricter level of specificity.

---

[28] *Id.*
[29] *Diaz,* 116 F.4th at 464 (citing *Rahimi*, 144 S. Ct. at 1901-2 (internal citation omitted)).
[30] *Id.* (citing *Rahimi*, 144 S. Ct. at 1902 (internal citation omitted)).
[31] *Id.* (citing *Rahimi*, 144 S. Ct. at 1902 (internal citation omitted)).
[32] *Rahimi*, 144 S. Ct. at 1903.
[33] *Rahimi*, 144 S. Ct. at 1897.
[34] *Id.* at 1898.

While *Rahimi* likely issued to clarify the confusion left by *Bruen*, lower courts have remained confused. But this is of little surprise considering that the justices themselves seemed to disagree on that exact level of specificity, with the justices splintering off into concurrences that applied seemingly differing versions of the test. Arguably, one of the only things the eight justices in *Rahimi* appeared to agree on was the outcome, and even the justice who wrote *Bruen*, Justice Thomas, disagreed with that.

Wading into the post-*Rahimi* trenches, the Fifth Circuit issued its opinion in *Diaz*, denying both a facial and as applied challenge to the constitutionality of § 922(g)(1) and finding historical analogues warranting Diaz's disarmament. In so holding, the court explained that the Second Amendment applies to *all* individuals—even felons—and thus that § 922(g)(1) fell within the scope of the Second Amendment—satisfying *Bruen*'s first step.[35] The court devoted the bulk of its analysis to *Bruen*'s second step—determining whether § 922(g)(1)'s regulation of firearm use, in this way, is "consistent with the Nation's historical tradition."

Applying *Bruen* and *Rahimi*, the court looked to theft laws as analogues to the crime of vehicle theft, of which Diaz was convicted.[36]

In comparing the *how*'s, the Fifth Circuit observed that theft crimes were generally punished by death penalty or estate forfeiture—severe, permanent punishments, generally considered to be felony punishments by legal scholars and historians.[37] Section 922(g)(1) also

---

[35] *Diaz*, 116 F.4th at 466 (citing *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting) ("[A]ll people have the right to keep and bear arms," but "history and tradition support Congress's power to strip certain groups of that right.")).
[36] *Id.* at 468-69.
[37] *Id.* at 467.

imposes severe, permanent punishment, although of arguably lesser severity through permanent disarmament.[38] Thus, following the logic of *Rahimi*,[39] if capital punishment was a permissible punishment for theft, "then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible."[40]

In considering the "why," the Fifth Circuit explained that "these laws were 'justified by the need to adequately punish felons, deter reoffending, and protect society from those proven untrustworthy to follow the law.'"[41] The court observed a similar justification for § 922(g)(1).[42]

Concluding, the *Diaz* court emphasized that its holding was "not only premised on the fact that Diaz is a felon" as "[s]imply classifying a crime as a felony does not meet the level of historical rigor required by *Bruen* and its progeny."[43] The conviction was upheld because Diaz's theft conviction matched a Founding-era analogue and that analogue imposed a punishment at least as severe as disarmament.

## IV.    ANALYSIS

While the precise framework for evaluating statutes like § 922(g)(1) post-*Bruen* remains in flux, this Court reads *Rahimi* as loosening the analytical straitjacket fastened by *Bruen*. This is of paramount importance in cases like Patino's, where it appears all but certain no historical *twin* exists for disarming individuals convicted only of drug possession. Freed from that

---

[38] *Id.* at 469 (citing *Rahimi*, 144 S. Ct. at 1898).
[39] In *Rahimi*, the Supreme Court found the lesser punishment of temporary disarmament under § 922(g)(8) acceptable because the historical analogue allowed for imprisonment. *Id.* at 1902.
[40] *Diaz*, 116 F.4th at 469 (discussing *Rahimi*, 144 S. Ct. at 1902).
[41] *Id.*
[42] *Id.*
[43] *Id.*

straitjacket, the Government draws analogies to other, less similar Founding-era laws, such as those concerned with contraband and forgery. Based on these laws, the Court finds that the Government has met its burden demonstrating that American history and tradition support disarming Patino. And since Patino's as applied challenge fails, his facial challenge must fall, as well.

### A. As Applied

Because Patino is among "the people" protected by the Second Amendment and "[t]he plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1),"[44] the sole question before this Court is whether the Government has supplied historical analogues that indicate that disarming Patino does not violate his constitutional rights. Any analogue must exhibit similarity both as to the *type* and *purpose* of the punishment,[45] although it need not be a "dead ringer."[46] The relevant predicate convictions under § 922(g)(1) are those "punishable by imprisonment for a term exceeding one year"[47]—*i.e.*, felonies. Patino's sole relevant felony conviction for consideration is possession of more than four ounces of marijuana.

The Government has carried that burden, demonstrating that America has a longstanding tradition of disarming those with criminal histories analogous to Patino's. Specifically, the Government relies principally on Founding-era laws criminalizing possession of illicitly obtained goods and going armed laws.

---

[44] *Diaz*, 116 F.4th at 467.
[45] *Bruen*, 597 U.S. at 29 (courts must consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense").
[46] *Id.* at 24, 29.
[47] *See* 18 U.S.C. § 922(g)(1).

These laws criminalizing illicitly obtained goods involved mostly stolen or forged goods. For example, one Virginia law criminalized, punishable by death, knowing receipt of a stolen horse. If capital punishment was permissible to respond to possessing contraband like a stolen horse, reasons the Government, "then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible."[48]

Patino refutes this argument, contending that the purposes behind laws criminalizing possession of stolen goods or counterfeiting are too different from that behind criminalizing marijuana possession. Specifically, Patino argues that, with respect to stolen goods, "the manner of acquisition of an item is unlawful," for drugs, "possession of the item itself is unlawful."

However, this Court does not read *Rahimi* as requiring such a granular analysis. As most other courts, this Court understands *Rahimi* as *broadening* the analogical reasoning requirement imposed by *Bruen*. Immediately post-*Bruen*, courts seemed to interpret the new precedent as suggesting "a law trapped in amber."[49] For example, in *Rahimi*, the Fifth Circuit struck down a conviction temporarily disarming an individual with a domestic violence restraining order.[50] It found that the offered historical analogues were too different as they disarmed people by class or group rather than after individualized findings of credible threats to identified potential victims.[51] Additionally, their purpose was preservation of political and

---

[48] *United States v. Wilson*, No. CR 22-238, 2024 WL 4436637, at *4 (E.D. La. Oct. 6, 2024) (citing *Diaz*, 116 F.4th at 464).
[49] *Rahimi*, 144 S. Ct. at 1897.
[50] *Rahimi*, 61 F.4th at 450–51.
[51] *Id.* at 457.

social order, not protection of an identified person from specific threat posed by another.[52] In reversing the Fifth Circuit's holding and finding that surety and going armed laws were sufficiently similar because they, like the restraining order, were implemented to "mitigate demonstrated threats of physical violence,"[53] the Court suggested that the Fifth Circuit had erred by conducting too stringent an analogical analysis.

As observed by Justice Gorsuch in his *Rahimi* concurrence, *Bruen*'s history and tradition test seeks to ensure that "the Constitution the people adopted remains our enduring guide."[54] By anchoring judicial analysis in history and tradition, judges are kept "in their proper lane,"[55] guided by the "*principles* that underpin our regulatory tradition."[56] Relying on principles, rather than historical twins, ensures that courts are not handcuffed to only those laws in place at the Founding—an approach that would forsake sweeping technological advancements, shifting moral and social norms, legislative innovation, and the reality that early legislatures may not have "maximally exercised their power to regulate."[57] In other words, we are *guided*, not *shackled*, by history.

In comparing the analogues to that of § 922(g)(1), the Government claims that all the laws share a common purpose: deterring lawlessness and violence. The Court agrees and goes one step further by noting that Congress has long recognized "that drugs and guns are

---

[52] *Id.*
[53] *Id.*
[54] *Id.* at 1908 (Gorsuch, J., concurring).
[55] *Id.*
[56] *Id.* at 1904 (Sotomayor, J., concurring).
[57] *Id.* at 1925 (Barrett, J., concurring).

a *dangerous* combination."[58] Accordingly, the Founding-era laws cited by the Government qualify as "relevantly similar" evidence that "establish[es] that our country has a historical tradition of severely punishing people like [Patino] who have been convicted" of possessing contraband.[59]

That the Government has not (or cannot) "cited to Founding-era laws prohibiting drug-trafficking, specifically, is not dispositive."[60] "[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791."[61] The government need not identify a "historical *twin*"; it need only identify a "historical *analogue*."[62] It has done so.

Permanently disarming Patino is also merited based on America's longstanding tradition of disarming those who have been convicted of serious crimes suggesting they may pose a risk of violence or other danger to public safety.[63] From the earliest days of common law, "firearm regulations have included provisions barring people from misusing weapons to harm or menace others."[64] Among those provisions are "going armed" laws that targeted conduct "disrupt[ing] the public order . . . and le[ading] almost necessarily to actual violence."[65]

---

[58] *Smith v. United States*, 508 U.S. 223, 240 (1993) (citing statistics on the percentage of murders relating to the drug trade) (emphasis added).

[59] *Diaz*, 116 F.4th at 465.

[60] *Wilson*, 2024 WL 4436637, at *5.

[61] *Rahimi*, 144 S. Ct. at 1897–98.

[62] *Bruen*, 597 U.S. at 30.

[63] *Wilson*, 2024 WL 4436637, at *5.

[64] *Rahimi*, 144 S. Ct. at 1899.

[65] *Id.* (internal quotation marks, citation, and alterations omitted).

In the instant case, Patino's predicate felony drug conviction reveals that he "may pose a comparable risk of violence or other *danger* to public safety."[66] Courts post-*Bruen* have stressed this dangerousness element in analyzing as-applied challenges to § 922(g)(1),[67] highlighting that " 'dangerousness' of some form has long been considered sufficient ground for depriving a person of their right to keep and bear arms."[68] As noted by the Government, Congress has long recognized "that drugs and guns are a *dangerous* combination."[69] And several federal appellate courts have recognized that "drug dealing is notoriously linked to violence."[70] Thus, permanently disarming felons like Patino who have committed serious drug *and* gun felonies, felonies often associated with violence, is consistent with the Nation's historical tradition of firearm regulation.

Finally, "for good measure, courts across the country have held Section 922(g)(1) constitutional as applied to defendants with predicate convictions resembling one or more of

---

[66] *Id.* (emphasis added).

[67] *See, e.g., United States v. DeLeon*, No. EP-22-CR-01580-DCG (1), 2024 WL 2066528, at *15-17 (W.D. Tex. May 6, 2024), *overruled in part by Diaz*, 116 F.4th at 467 (considering dangerousness of felonies in section 922(g)(1) challenge); *United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024) (America's "history and tradition demonstrate that Congress may disarm individuals they believe are dangerous"); *United States v. Barwicks*, No. 20-CR-00563, 2024 WL 1521473, at *11 (N.D. Ill. Apr. 8, 2024) (finding evidence "that the colonies disarmed dangerous people").

[68] *United States v. Small*, No. CR 16-381-1, 2024 WL 4041752, at *4 (E.D. Pa. Sept. 4, 2024) (collecting Founding-era laws allowing seizure of arms and/or other weapons of dangerous individuals or those that disrupt the peace).

[69] *Smith v. United States*, 508 U.S. 223, 240 (1993) (citing statistics on the percentage of murders relating to the drug trade) (emphasis added).

[70] *Wilson*, 2024 WL 4436637, at *5 (citing *United States v. Torres–Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) (citations omitted); *see also, e.g., United States v. Barton*, 633 F.3d 168, 174 (3d Cir. 2011) ("[O]ffenses relating to drug trafficking and receiving stolen weapons are closely related to violent crime."); *United States v. Diaz*, 864 F.2d 544, 549 (7th Cir. 1988) ("[T]he illegal drug industry is, to put it mildly, a dangerous, violent business.").

[Patino]'s predicate convictions."[71] In these cases, courts have routinely upheld convictions under § 922(g)(1) based on drug-related offenses like possession.

### B. Facial Challenge

To sustain a facial challenge, "the challenger must establish that no set of circumstances exists under which the statute would be valid."[72] Aside from the fact that no circuit court, including the Fifth Circuit, has held § 922(g)(1) facially unconstitutional post-*Bruen*,[73] Patino cannot establish a facial challenge because "the statute is constitutional as applied to the facts of his own case."[74]

---

[71] *Id.* (citing *United States v. Jackson*, 110 F.4th 1120, 1125–29 (8th Cir. 2024) (holding Section 922(g)(1) constitutional as applied to a defendant with predicate drug offenses); *United States v. Canales*, 702 F. Supp. 3d 322, 327–32 (E.D. Pa. 2023) (holding Section 922(g)(1) constitutional as applied to a defendant with predicate drug convictions); *United States v. Goins*, 647 F. Supp. 3d 538, 554–55 (E.D. Ky. 2022) (holding Section 922(g)(1) constitutional as applied to a defendant with predicate convictions for DUI and drug possession); *United States v. Pearson*, No. 22-CR-271, 2023 WL 6216527, at *3 (E.D. Pa. Sept. 25, 2023) (holding Section 922(g)(1) constitutional as applied to defendant with predicate drug-distribution and firearm convictions); *United States v. Blackshear*, No. 23-CR-159, 2023 WL 5985284, at *3 (E.D. Pa. Sept. 14, 2023) (same); *United States v. Reichenbach*, No. 4:22-CR-57, 2023 WL 5916467, at *8–10 (M.D. Pa. Sept. 11, 2023) (holding Section 922(g)(1) constitutional as applied to defendant with predicate drug convictions); *United States v. Wise*, No. 21-CR-511, 2023 WL 6260038, at *4–7 (W.D. Pa. Sept. 26, 2023) (finding Section 922(g)(1) constitutional as applied to defendant with one predicate drug-trafficking conviction). Many of those courts reason, as the Court has here, that "guns and drugs" are "a dangerous combination increasing the risk of violence addressed by Congress in dispossessing significant long-time drug dealers of firearms." *Pearson*, 2023 WL 6216527, at *3 (internal citation and quotation marks omitted); *see also, e.g.*, *Reichenbach*, 2023 WL 5916467, at *9 ("There are few crimes that pose a greater risk to the public than drug trafficking, and fewer still where the dangerous connection between the crime and possession of firearms is more present or better understood."); *Canales*, 702 F. Supp. 3d at 321 ("[D]isarming individuals . . . who have shown a proclivity toward drug trafficking[ ] serves the same purpose of protecting the public from unnecessary violence.")).

[72] *Id.* at *9 (quoting *Salerno*, 481 U.S. at 745).

[73] *United States v. Fulwiler*, No. 23-30152, 2023 WL 7118748, at *1 (5th Cir. Oct. 27, 2023) (per curiam) (collecting cases).

[74] *Diaz*, 116 F.4th at 471 (citing *Rahimi*, 144 S. Ct. at 1898).

## CONCLUSION

Since *Bruen* was issued, this Court has received countless challenges from defendants to their gun-related convictions. And since *Bruen*, this Court has denied most of those challenges. Today is no different.

In conclusion, this Court finds that the Government has provided sufficient historical analogues warranting disarming Patino based on his underlying felony possession conviction. Because 922(g)(1) is constitutional as applied to him, his facial challenge also fails. The Motion for Reconsideration is thus **DENIED**.

It is so **ORDERED**.

SIGNED this 26th day of November, 2024.

_____
DAVID  COUNTS
UNITED STATES DISTRICT JUDGE